UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MELVIN KINDLE, et al.                                            PLAINTIFFS


v.                                          CIVIL ACTION NO. 3:07-CV-158-S


CITY OF JEFFERSONTOWN, et al.                                    DEFENDANTS


**MEMORANDUM OPINION**

This matter is before the court on defendants' motion for summary judgment (DN 30) and

plaintiffs' cross-motion for partial summary judgment (DN 31).  Responses and replies have been

filed (DN 42; DN 43; DN 47; DN 48).  For the reasons that follow, the court will grant defendants'

motion for summary judgment and deny plaintiffs' cross-motion.

BACKGROUND

This action arises from the termination of employment of plaintiffs Melvin Kindle

("Kindle"), Bradley Silveria ("Silveria"), and Diedra Handy ("Handy")[1] (hereinafter collectively,

"Plaintiffs") with defendant City of Jeffersontown, Kentucky ("Jeffersontown").  Plaintiffs were

terminated on January 25, 2007, following a proceeding conducted before the Jeffersontown Civil

Service Commission ("JCSC" or "the Commission").

 Plaintiffs worked for the Jeffersontown Police Department ("JPD").  Kindle was a police

officer and Silveria and Handy were dispatchers.  This case stems from a report drafted by Plaintiffs

titled "Report Pursuant to KRS 61.102," which alleged various incidents of misconduct on the part

---

[1]At the time this action was filed, Handy was known as "Diedra Adkins."  She married in
the interim.

of Lieutenant Colonel Peggy Emington of the JPD, in her official capacity ("Emington"). Plaintiffs tendered the report to Jeffersontown Mayor Clay S. Foreman ("Foreman"), Jeffersontown Chief of Police Colonel Fred Roemele ("Roemele"), Emington, and members of the Jeffersontown City Council ("JCC"). The report gave rise to a series of events that ultimately led to Plaintiffs' termination. It is undisputed that Plaintiffs were terminated *because* of the report; it is disputed, however, *why* and *how* the report led to Plaintiffs' termination.

Plaintiffs allege that they were terminated because Foreman mobilized the resources of Jeffersontown to retaliate against them for their First Amendment speech and whistleblowing report. Defendants maintain that their actions were prescribed by law and executed in due course. Defendants assert that Plaintiffs were terminated based on the Findings, Conclusions, and Order on Hearing of the JCSC that Plaintiffs' report was false, reckless, and damaging. Defendants further assert that Plaintiffs' failure to exercise their due process rights during the course of proceedings following the report contributed to the JCSC's unfavorable disposition of their case.

The legal significance of the content of the Report Pursuant to KRS 61.102 is critical to the court's analysis of Plaintiffs' First Amendment claim. In turn, the contents of the report must be considered in the context of the facts.

In September 2006, Silveria and Handy informed Roemele that a hostile work environment created by Emington had caused them to go on medical leave. Roemele indicated to Silveria and Handy that he was unable to do anything with regard to Emington because his hands were "politically tied." *Deposition of Bradley Silveria*, pp. 26-27; *Deposition of Diedra [Handy]*, Vol. 2, pp. 42-45; *Deposition of Lieutenant Colonel Fred Roemele*, pp. 13-15.

On October 3, while both Silveria and Handy remained on medical leave, seven JPD

sergeants and two JPD corporals met with Roemele and reported allegations of misconduct by Emington. Roemele told Foreman about the meeting. *Amended Complaint*, Exhibit 1.

On October 10, Plaintiffs met with Foreman and reported alleged violations of police department policy by Emington. Plaintiffs told Foreman that they had consulted an attorney regarding their concerns and were considering filing a protected report regarding issues in the police department. Foreman told Plaintiffs that they should hold off on taking any action until after election day, four weeks away, which was consuming much of his time. *Deposition of Clay S. Foreman*, pp. 60-61. Foreman asked Roemele that he monitor the situation closely.

On October 27, Plaintiffs tendered the Report Pursuant to KRS 61.102 to those persons named above. The report was tendered as an attachment to a letter addressed to the Jeffersontown Ethics Commission ("JEC"), stating that Plaintiffs were "filling [sic] an Official Complaint with the City of Jeffersontown, KY Ethics Commission." The report alleged:

> [F]acts and information relative to actual and/or suspected violations of laws, ordinances, policies and procedures of the City of Jeffersontown and other authorities and jurisdictions. . . [and] actual incidents and ongoing practices of mismanagement, waste, and abuse of authority occurring within the Jeffersontown Police Department and perpetrated by Lt. Col. Peggy Emington[.] *Am. Compl.*, Exhibit 3.

Specifically, Plaintiffs' report alleged that Emington (1) violated federal and state wage and hour laws by requiring dispatchers to report for duty fifteen minutes early and not paying overtime; (2) generated unnecessary overtime by forcing some dispatchers to work overtime so that other dispatchers could attend social events with Emington; (3) violated staffing policy by leaving only one dispatcher on duty so that other dispatchers could accompany Emington on Secretary's Day; (4) failed to contribute to the retirement account of a part-time employee and then reduced that employee's work schedule when the employee complained to the administration; (5) improperly

-3-

used the KASPAR system by checking employees' controlled substance prescriptions; (6) failed to qualify with her firearm; and (7) committed various and miscellaneous acts and/or incidents of mismanagement and/or abuse of authority.[2]  *Id.*

Roemele notified Foreman that pursuant to JPD Standard Operating Procedures ("SOPs") he felt obligated to have the police department investigate the allegations against Emington.  *Id.* at Exhibit 4.  On November 1, Foreman advised Roemele that the matter had been referred to the Jeffersontown Board of Ethics, that the JPD should not conduct an investigation, and that the report would be investigated by another law enforcement agency pending disposition of the matter by the Board of Ethics.[3]  *Id.* at Exhibit 5.

Plaintiffs allege that Foreman prevented Roemele from conducting an investigation because Foreman intended to retaliate against Plaintiffs for the report.  Foreman asserts that he prevented a JPD investigation because the JEC had exclusive jurisdiction over the report.  *Depo. of Foreman* at 27-29.

On November 20, Plaintiffs by counsel notified the JEC that they were withdrawing their complaint because Jeffersontown had taken retaliatory action against Plaintiffs.  Plaintiffs did not appear at the JEC hearing on November 21 that was scheduled as a result of their report.

_____

[2]This paragraph alleged that Emington (a) accused an employee of lying about a medical condition and threatened to terminate the employee; (b) gave an adverse reference to an employee's prospective new employer because she was "mad at him"; (c) berated officers at crime scenes; (d) showed favoritism to some clerks with regard to lunch breaks; (e) accused employees of hiding information concerning military pay; and (f) failed to give civilian employees yearly evaluations.

[3]Though Foreman here refers to the "Jeffersontown Board of Ethics," the court will refer to the agency by its proper name, "Jeffersontown Ethics Commission ("JEC")," regardless of how it appears in the record.

Nonetheless, the JEC reviewed Plaintiffs' complaint.  On November 30, the JEC dismissed the complaint with prejudice for lack of evidence establishing jurisdiction.

On November 28, Emington filed a formal complaint against Plaintiffs with Foreman.  The complaint requested a formal personnel investigation and Civil Service charges be brought against Plaintiffs.  Emington's complaint alleged that Plaintiffs' allegations against her in their report were false and that Plaintiffs had violated KRS 15.520[4] and several JPD SOPs.[5]  Emington further alleged that Plaintiffs knowingly disclosed false information or disclosed information with reckless

---

[4]KRS 15.520 states, in pertinent part:

**Complaints against police officers - Manner of investigation and hearing.**

(a) Any complaint taken from any individual alleging misconduct on the part of any police officer, as defined herein, shall be taken as follows:
    2.  If the complaint alleges abuse of official authority or a violation of rules and regulations of the department, an affidavit, signed and sworn to by the complainant, shall be obtained. . .
(e) Any charge involving violation of any local unit of government rule or regulation shall be made in writing with such specificity so as to fully inform the police officer of the nature and circumstances of the alleged violation in order that he may be able to properly defend himself.  The charge shall be served on the police officer in writing. . .
(f) When a police officer has been charged with a violation of departmental rules or regulations, no public statements shall be made concerning the alleged violation by any person or persons of the local unit of government or the police officer so charged, until final disposition of the charges. . .
(h) When a hearing is to be conducted by any appointing authority, legislative body, or other body as designated by the Kentucky Revised Statutes, the following administrative due process rights shall be recognized and these shall be the minimum rights afforded any police officer charged. . .
    2.  Copies of any sworn statements or affidavits to be considered by the hearing authority and any exculpatory statements or affidavits shall be furnished to the police officer no less than seventy-two (72) hours prior to the time of any hearing. . .

[5]Emington alleged that Plaintiffs violated JPD SOPs 6029.0 (Truthfulness); 6026.0 (Establishing Elements of a Violation); 6031.0 (Reporting Violations of Laws, Ordinances and Procedures); 6038.0 (Grievance Procedure); and 6005.0 (Complaint Processing).

disregard for its truth under KRS 61.102.  Upon receipt of Emington's complaint, Foreman referred the matter to the JCSC.

Plaintiffs allege that Foreman approved the initiation of proceedings before the JCSC because Foreman intended to retaliate against Plaintiffs for the report.  Foreman asserts that he forwarded Emington's complaint to the JCSC in order to comply with the civil service ordinance. *Depo. of Foreman* at 89-91.

On December 5, the JCSC issued a notice of hearing to Plaintiffs advising them of their procedural due process rights under the civil service ordinance and scheduling a hearing on the matter for December 13.  The hearing was continued at Plaintiffs' request until January 25, 2007.

On December 15, Emington filed a declaration of rights action in the Jefferson County, Kentucky Circuit Court against Plaintiffs, Jeffersontown, and three members of the JCC,[6] alleging that the defendants had made public comments about the pending administrative charges against Plaintiffs in violation of KRS 15.520.  It appears that the suit has been dismissed.[7]

Plaintiffs allege that the lawsuit was frivolous and undertaken for and on behalf of defendants to retaliate against Plaintiffs for the report.

On January 5, 2007, Roemele retired as Chief of the JPD and Lieutenant Colonel Kim Weber ("Weber") became interim Chief.  On January 11, memoranda from Emington to Weber and from Weber to Foreman were generated to establish for the JCSC record that the complaint Emington filed against Plaintiffs was filed in Emington's official capacity on behalf of Jeffersontown and not

---

[6]*Peggy Emington v. The City of Jeffersontown*, *et al.*, Jefferson Circuit No. 06-CI-11340.

[7]It appears that the case was dismissed on July 8, 2008, for the reason that no pretrial steps had been taken in the past year.

in her individual capacity.  *Deposition of Kim Weber*, Exhibit 2.

Plaintiffs allege that Foreman caused Jeffersontown to adopt and assume prosecution of the JCSC proceeding initiated by Emington because Foreman intended to retaliate against Plaintiffs for the report.  Foreman asserts that his understanding from the beginning was that Emington's complaint had been brought on behalf of Jeffersontown.  *Id.*

On January 23, Plaintiffs filed a Motion for Temporary Restraining Order in Jefferson Circuit Court to prohibit the JCSC from conducting the hearing set for Plaintiffs on January 25.  On January 24, the Jefferson Circuit Court entered an order denying Plaintiffs' motion.[8]

On January 25, the JCSC convened to hear the allegations of misconduct against Plaintiffs. Plaintiffs appeared and by counsel informed the Commission:

> [Plaintiffs] have made an election to pursue their claims in circuit court. . . as opposed to this Commission. [Plaintiffs] will not be presenting any evidence, not calling any witnesses, not making any arguments.  With that notice to you - all [Plaintiffs] frankly ask that [Plaintiffs] be excused at this point.  *Transcript of Civil Service Commission Proceedings*, pp. 4-5.

Plaintiffs, with the exception of Kindle, exited the hearing room.

Commission counsel then advised the Commission that he and counsel for the parties had discussed that part of the Third Pre-Hearing Order which provided for a bifurcated hearing for the purpose of ruling on [Plaintiffs'] motion to dismiss the complaint as a violation of KRS 90.120. Because the evidence to be offered in both segments was substantially identical, counsel for the Complainant requested that all evidence be presented and that the Commission's ruling on [Plaintiffs'] motion be deferred until all the evidence had been heard.  There being no objection, the

---

[8]Also on January 24, an agreed order was entered dismissing Jeffersontown and the three JCC members as defendants.

Commission commenced with the proceeding. Complainant presented its case. Kindle remained in the room for the hearing but did not participate. At the conclusion of Complainant's case, the Commission retired to deliberate.

Following deliberations, the Commission returned to open session and announced that it had found Plaintiffs had violated three JPD rules.[9]  Upon proper motion and second, the Commission terminated Plaintiffs' employment with Jeffersontown pursuant to § 35.010(F) of the Jeffersontown Code of Ordinances. On February 5, the Commission issued written and particularized findings of fact as required by Kentucky law.

Plaintiffs filed this civil rights action against defendants pursuant to 42 U.S.C. § 1983 and state law on February 26. Defendants subsequently removed the case to this court.

Plaintiffs specifically allege unlawful retaliation under KRS 61.102 on the part of Jeffersontown; deprivation of free speech on matters of public concern under Section 1983 on the parts of Jeffersontown and Foreman; deprivation of free expression affecting elections under Section 1983 on the parts of Jeffersontown and Foreman; and wrongful discharge contrary to fundamental and well-defined public policy under state law.

This court has federal question jurisdiction over the claims arising under 42 U.S.C. § 1983 and supplemental jurisdiction over the related state law claims.

DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v.*

---

[9]The Commission found that Plaintiffs had violated JPD SOPs 6029.0 (Truthfulness); 6031.0 (Reporting Violations of Laws, Ordinances and Procedures); 6038.0 (Grievance Procedure).

*S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute also must be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Plaintiffs argue that they were terminated in violation of their rights under the First Amendment and the Kentucky Whistleblower Statute, KRS 61.102.  Defendants argue that Plaintiffs have waived their claims by failure to exercise the due process rights and exhaust the remedies available to them below.  Defendants further argue that Plaintiffs' First Amendment and whistleblower claims fail as a matter of law.

The court finds that there are no genuine issues of material fact, only competing interpretations of undisputed facts.  The court finds that Plaintiffs have not waived their claims but that Plaintiffs' claims fail as a matter of law.

Defendants argue that Plaintiffs have waived their claims by failing to exercise the due process rights and exhaust the remedies available to them below.  Specifically, Defendants point to

Plaintiffs' withdrawal from participation in the JCSC hearing and "election [to] pursue the claims in circuit court as opposed to this commission." *Defendants' Motion for Summary Judgment* at 24. Defendants cite *Jackson v. Richards Medical Co.*, 961 F.2d 575, 580 (6th Cir. 1982), for the proposition that "[I]gnorance of specific legal rights or failure to seek legal advice should not. . . permit an aggrieved employee aware of his general rights to sit on those rights until he leisurely decide[s] to take action." However, *Jackson*, which held that ignorance of the law does not toll the limitations period for filing an age discrimination claim with the EEOC, is inapposite here. Exhaustion of administrative remedies is not prerequisite to Plaintiffs' claims arising under either Section 1983 or KRS 61.102. *Patsy v. Bd. of Regents*, 457 U.S. 496, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982); *KRS 61.103(2)*. Moreover, as defendants themselves observe, "[T]he charges being heard by the Commission were *not* Plaintiffs' claims. They were the charges of the Jeffersontown Police Department, initiated by Emington, against the Plaintiffs." *Motion for Summary Judgment* at 25 (emphasis theirs). Plaintiffs have not waived their claims against defendants by virtue of any past action or inaction involving the JCSC. Plaintiffs' claims are cognizable.

Defendants argue that Plaintiffs' whistleblower claims fail as a matter of law because Jeffersontown is not an "employer" under the Kentucky Whistleblower Act, and only employers are subject under the statute. "Employer means the Commonwealth of Kentucky or any of its political subdivisions." *KRS 61.101(2)* At issue is whether Jeffersontown is a "political subdivision" of the Commonwealth of Kentucky. The parties agree that Jeffersontown is a municipal corporation ("municipality") but dispute whether municipalities are political subdivisions of the Commonwealth of Kentucky, and thus whether Jeffersontown is an employer under the statute. The Whistleblower Act does not define "political subdivision." Therefore, the court must look beyond the plain

-10-

language of the statute in considering the issue.

In support of their argument that municipalities are not political subdivisions of the Commonwealth of Kentucky, defendants cite a series of state court decisions which distinguish municipalities from counties, agencies, and other political subdivisions based on principles of sovereign immunity. *Kentucky Ctr. for the Arts v. Berns*, 801 S.W.2d 327, 331 (Ky. 1990); *see also Calvert Investments, Inc. v. Louisville and Jefferson County MSD*, 805 S.W.2d 133, 135 (Ky. 1991) ("Common law tort immunity was repudiated for municipal corporations."); *Withers v. Univ. of Kentucky*, 939 S.W.2d 340 (Ky. 1997).

Kentucky courts have recognized this significant distinction. Compare *Lexington Fayette Urban County Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004) ("Kentucky counties are cloaked with sovereign immunity. This immunity flows from the Commonwealth's inherent immunity by virtue of a Kentucky county's status as an arm or political subdivision of the Commonwealth") with *Berns* ("[M]unicipal corporations are local entities created by act of the General Assembly and not agencies performing the services of a central state government. As such they do not qualify for sovereign immunity"). *Baker v. McDaniel*, 2008 WL 215241 (E.D. Ky., 2008).

In support of their argument that municipalities are political subdivisions, Plaintiffs cite *Smith v. Bd. of Educ. of Ludlow, Ky.*, 111 F.2d 573, 575 (6th. Cir. 1940), which states, "[T]he law appears to be well settled in Kentucky that a municipality is a political subdivision of the State." However, *Smith* predates the enactment of the Whistleblower Act and Kentucky's courts have not once mentioned *Smith* in the nearly seventy years since the Sixth Circuit's holding. Plaintiffs further argue that basic principles of statutory construction and Kentucky jurisprudence support the conclusion that municipalities are political subdivisions under the statute. Plaintiffs argue that

-11-

because KRS 61.102 protects employees who blow the whistle on the violation of an "ordinance," which commonly means a "municipal statute," it follows that municipalities are political subdivisions. However, Plaintiffs' syllogism is flawed. KRS 61.102 protects employees who blow the whistle on the violation of "any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions." Under Plaintiffs' logic, because KRS 61.102 protects employees who blow the whistle on a violation of federal law, it would follow that the United States, too, is a political subdivision of the Commonwealth of Kentucky, which clearly is absurd. Finally, Plaintiffs argue that public policy considerations support the conclusion that municipalities are political subdivisions under the statute.

There is little in the plain language of KRS 61.101 et seq. to guide the court in determining whether municipalities are political subdivisions of the Commonwealth of Kentucky under the statute. Application of the traditional textual canons provides little assistance. Statutes in pari materia reveal that state lawmakers have used the terms "political subdivisions" and "municipalities" both conjunctively and disjunctively across the whole spectrum of the Kentucky Revised Statutes. However, because the Whistleblower Act defines "employer" as "the Commonwealth of Kentucky, or any of its political subdivisions" to the exclusion of "municipalities," which are distinct from counties in nature and from agencies and counties based on sovereign immunity, the court finds that municipalities are not political subdivisions under the statute. Therefore, Jeffersontown is not an employer under the Kentucky Whistleblower Act.

Defendants argue that Plaintiffs' Section 1983 claims fail as a matter of law because Plaintiffs' report is not protected by the First Amendment. "[W]hen public employees make

-12-

statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). Defendants argue that Plaintiffs' report was within the scope of Plaintiffs' official duties as public employees. However, this case does not come within the scope of *Garcetti*. Whistleblowing reportage is not a part of police officers or dispatchers' job duties, generally. Nor was it a core responsibility of Plaintiffs as employees of the JPD. Plaintiffs did not make their report because they were actually employed to do so. Accordingly, *Garcetti* is inapplicable. *Id.* at 1960.

"In analyzing public employee speech claims, federal courts must first determine whether the employee was speaking as a citizen on a matter of public concern." *Pickering v. Bd. of Educ. of Township High School Dist. 205*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). If not, then the employee has no cause of action based on the employer's reaction to her speech. *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Defendants argue that Plaintiffs have no First Amendment claim because the report did not touch on a matter of public concern. Instead, defendants characterize the report thusly:

> [A] litany of petty grievances and complaints rooted in their dissatisfaction with a supervisor or work environment. . . issues that can be best construed as indirectly affecting their jobs. . . can best be described as allegations concerning problems in the management of the Jeffersontown Police Department. *Motion for Summary Judgment* at 17-18.

Plaintiffs argue that the report constituted speech on a matter of public concern because it regarded the efficiency and operations of the JPD.

> Plaintiffs' protected report addresses and encompasses violations of federal and state wage and hour law, wasteful managerial practices that cost the taxpayer's [sic]

-13-

unnecessary expense, violation of state laws and regulations, violations of Jeffersontown policies and procedures, and abusive misconduct that was undermining the efficiency and operations of the Jeffersontown Police Department. . . *Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment* at 17.

*Pickering* and *Connick* occupy opposite ends of the continuum concerning public employee speech on matters of public concern. The court's task is to discern where on the continuum Plaintiffs' report falls for First Amendment purposes.

*Pickering* addressed speech on a matter of public concern. In *Pickering*, a school teacher was terminated for sending a letter to a local newspaper in connection with a recently proposed tax increase that was critical of the way in which the Board and the district superintendent of schools had handled past proposals to raise new revenue for the schools. Regarding the plaintiff's speech (the letter) in *Pickering*, the Court held:

> [T]he question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal. *Pickering* at 571-72.

*Pickering* balanced the interests of public employees, as citizens, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public services performed through its employees by limiting their speech. *Id.* at 568. Speech that weighs in favor of public employees' interests in commenting on matters of public concern is accorded First Amendment protection.

*Connick* addressed speech on a matter of private concern. The *Pickering* balancing test was

-14-

found inapplicable in *Connick* because speech on matters of private concern is not protected by the First Amendment.[10]   In *Connick*, an assistant district attorney was terminated for distributing a questionnaire to other employees concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns.[11]   Regarding the plaintiff's speech (the questionnaire) in *Connick*, the Court held:

> [Plaintiff's] questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that [Defendant] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. [Plaintiff's] discharge therefore did not offend the First Amendment. We reiterate, however, the caveat we expressed in *Pickering*: Because of the enormous variety of fact situations in which critical statements by. . . public employees may be thought by their superiors. . . to furnish grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general standard against which all such statements may be judged.   *Connick* at 154 (internal citations omitted).

Thus, there is no bright line rule delineating matters of public concern on one side from matters of private concern on the other. Each assessment of public employee speech under these circumstances is necessarily fact-specific. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick* at 147-48. As between *Pickering* and *Connick*, Plaintiffs' case more nearly approaches *Connick* territory.

---

[10]Speech on private matters may not be totally beyond the protection of the First Amendment but the greater point is immaterial here.

[11]It is worth noting that the Court separately addressed the issue of whether employees felt pressured to work in political campaigns. The Court found that matter to be of public concern and accordingly applied the *Pickering* balance.

The substance of Plaintiffs' report cannot be said to be important to the broad community interest.  It is clear that Plaintiffs felt that they were not treated fairly and equally in their jobs by Emington.  Indeed, Plaintiffs focus on the underlying history of the report in an effort to frame it as speech on a matter of public concern.  However, by and large the allegations in the report deal with issues that only indirectly affected Plaintiffs' jobs and had no impact on the safety and welfare of the people of Jeffersontown.  Though Plaintiffs specifically allege deprivation of free expression affecting elections, Plaintiffs' report cannot fairly be considered to have significantly contributed to the political or social discourse.  Moreover, that a matter is known to the public does not make it a matter of public concern.  Plaintiffs' case may have garnered some media attention but publicity adds nothing in defining the nature of the concern.  Plaintiffs' report was public employee speech on a matter of private concern.  Accordingly, Plaintiffs have no cause of action based on Jeffersontown's decision to terminate them based on their report.

Plaintiffs' First Amendment claims against Foreman in his individual capacity fail on the separate basis of qualified immunity.  As Mayor of Jeffersontown, Foreman is entitled to qualified immunity in his individual capacity unless Plaintiffs can "state a claim of clearly established law," *Mitchell v. Forsyth*, 472 U.S. 511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985), and "present evidence sufficient to create a genuine issue as to whether the defendant, in fact, committed those acts." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th. Cir. 1992).  Plaintiffs have failed to state a First Amendment claim.  Even if Plaintiffs had stated such a claim, they have failed to present any material evidence that would give rise to a claim against Foreman, individually.

Plaintiffs' First Amendment claims against Foreman in his official capacity and claims against the JCSC also fail as duplicative of the claims against Jeffersontown.  Official-capacity suits

-16-

"generally represent only another way of pleading an action against an entity of which an officer is an agent.  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (internal quotation marks and citations omitted).  The JCSC was created by Jeffersontown pursuant to KRS 95.761, and is not an entity that can be sued.  Jeffersontown is the proper target of Plaintiffs' complaint against the JCSC and Foreman, officially.  *Matthews v. Jones*, 35 F.3d 1046, 1049 (1994) (*citing Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S. Ct. 2304 (1989); *see also Smallwood v. Jefferson County Government*, 743 F.Supp. 502, 503 (W.D. Ky. 1990).

## CONCLUSION

Because the court finds that there are no genuine issues of fact and that defendants are entitled to summary judgment as a matter of law, defendants' motion for summary judgment is granted and plaintiffs' cross-motion is denied.

A separate order will be entered herein this date in accordance with this opinion.